IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| FARHAD DASTRANJ | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. PX 15-2436 |
| MEHDI DEHGHAN, | * | |
| Defendant. | * | |

******

## MEMORANDUM OPINION

Pending are Plaintiff's and Defendant's cross-motions for summary judgment (ECF Nos. 66, 67). The issues are fully briefed and hearing was held on Friday, August 4, 2017. For the reasons stated below, both motions are granted in part and denied in part.

## I.     BACKGROUND[1]

Plaintiff Farhad Dastranj ("Dastranj") is an Iranian citizen and resident seeking to immigrate to the United States. He attempted to obtain an Employment Based Fifth Preference Immigrant Investor Visa ("EB-5 Visa") under the Immigrant Investor Program (the "EB-5 Program"). ECF No. 67-2 at 1. To be eligible for an EB-5 Visa, the applicant must invest, or be actively in the process of investing, at least $500,000 in an enterprise that will benefit the United States economy by creating full time employment for not fewer than ten (10) qualified individuals. USA Investco ("Investco"), Northern Riverfront Marina and Hotel LLP ("Northern Riverfront"), and Wilmington Riverfront Development LLC ("Wilmington Riverfront") are North Carolina-based companies that facilitate prospective EB-5 investors' visa requirements by

---

[1] Unless otherwise noted, the following facts are taken from the parties' joint statement of undisputed facts at ECF No. 67-2.

1

coordinating investment in a qualified project located in Wilmington, North Carolina (the "EB-5 Project").[2] *Id.*

Defendant Mehdi Dehghan ("Dehghan") was employed by Investco as its Senior Vice President for Investor Relations and President of Middle East and Central Asian affairs. His responsibilities included acquiring investor capital for the Northern Riverfront and Wilmington Riverfront projects. *Id.* at 1–2.[3] For each EB-5 investor whom Dehghan brought to invest in the EB-5 Project, Investco paid Dehghan a $35,000 commission. *Id.* at 2.

Dehghan first met Dastranj in 2010 in Iran to discuss Dastranj's participation in the EB-5 Program generally and his investment in the Wilmington EB-5 Project more specifically. Over several meetings in Iran, Dehghan presented Dastranj with written documents prepared by Investco about the Wilmington EB-5 Project and discussed the terms of Dastranj's participation. *Id.* at 2. Dehghan specifically informed Dastranj the EB-5 visa Project required a minimum of $500,000 in a qualified investment such as the Wilmington project, plus a $75,000 administrative and attorneys' fee. Dehghan provided Dastranj with a Subscription Agreement to purchase an interest in the Wilmington EB-5 Project, which Dastranj signed on August 8, 2010. *Id.* at 3.

As of August 2010, federal law prohibited United States persons from engaging in financial transactions involving Iran without first obtaining a license issued by the Department of Treasury's Office of Foreign Asset Control ("OFAC"). Thus, a necessary prerequisite to transferring Dastranj's funds into the United States for the EB-5 Project was obtaining the proper OFAC license. *See generally* Iranian Transactions and Sanctions Regulations ("ITSR"), 31

---

[2] On May 2, 2016, Dehghan filed a third party complaint against Investco, Northern Riverfront, and Wilmington Riverfront for indemnification and contribution in which he argued that they were liable for Dastranj's injury. ECF No. 36. On December 1, 2016, this Court granted the third party Defendants' motion to dismiss. *See Dastranj v. Dehghan*, No. PX 15-2436, 2016 WL 7012299 (D. Md. Dec. 1, 2016).

[3] Dehghan's relationship with Dastranj was previously disputed. The parties now stipulate that Investco identified Dehghan as holding such offices on its website and provided him with business cards representing that he was a Senior Vice President for Investor Relations and President of Middle East and Central Asia. ECF No. 67-2 at 2.

C.F.R. §§ 560.101–560.901. Dehghan therefore connected Dastranj to Investco's attorney Ali Herischi to facilitate obtaining the OFAC license.

Because Dastranj did not have $575,000 at the time the gentlemen discussed the EB-5 program, Dastranj and Dehghan orally agreed that Dastranj would transfer funds incrementally to Dehghan who would hold the funds in his Iranian bank account until the funds totalled the dollar equivalent of $ 575,000. ECF No. 67-2 at 4. Dastranj and Dehghan further agreed that, once the payments reached the equivalent of $ 575,000 and the OFAC license was issued, Dehghan would transfer Dastranj's investment to United States and the EB-5 Project. Dastranj also informed Dehghan that he, Dastranj, would need to inspect and approve personally the EB-5 Project in North Carolina prior to authorizing the transfer of funds to the United States.

Beginning in the fall of 2010 and throughout 2011 and 2012, Dastranj made partial periodic payments that were transferred to Dehghan's Iranian bank account. *See* ECF No. 67-2 at 4–5. Aside from an initial $75,000 payment, Dastranj made these payments in Iranian rials. *See id.* Dehghan would then provide Dastranj signed, hand-written receipts documenting the value of the specific payment in both rials and United States dollars. *See id.*

On June 17, 2012, Dastranj applied for a B1/B2 nonimmigrant visa to enter the United States for inspection of the EB-5 investment Project. *Id.* at 6. His visa application was denied in October 2012. On June 30, 2013, Ali Herischi informed Dastranj and Dehghan that the United States granted the OFAC license for Dastranj's investment. *Id.* at 5.

Nonetheless, Dastranj was never able to visit and personally approve the investment project. Accordingly, on or about May 2013, Dastranj requested that Dehghan return his investment. *See* Pl.'s Mot. Summ. J., ECF No. 67-1 at 5. Dehghan never claimed that Dastranj's demand for his money back was inconsistent with the terms of their agreement. Dehghan simply

did not return any the funds.  For several years to follow, Dastranj continued to demand return of the funds to no avail. Although Dehghan repeatedly assured Dastranj that he would return the money (once claiming he would do so after he was "paid" by Investco), repayment to Dastranj never happened. *See* ECF No. 67-2 at 8–9. To date, Dehghan has not returned any of Dastranj's investment.

On August 17, 2015, Dastranj filed the instant Complaint against Dehghan asserting six counts: (1) breach of contract; (2) unjust enrichment; (3) fraud; (4) "Consumer Protection Violation–N.C. Gen. Stat. § 75-1.1;" (5) "Fraudulent and Other Prohibited Practices–N.C. Gen. Stat. § 78A-8"; and (6) "Fraudulent Interstate Transactions–15 U.S.C. § 77q." ECF No. 1. Dastranj's claims center on Dehghan's refusal to return Dastranj's investment monies once Dastranj was unable to visit the EB-5 project site and thus participate in the EB-5 program. *See generally id.* On February 10 and 11, 2017, Dastranj and Dehghan filed cross-motions for summary judgment. *See* ECF Nos. 66 & 67. The Court begins with Plaintiff's motion.

## II.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to

defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1).

When a court is called upon to decide cross-motions for summary judgment, it must review each motion separately as to whether either party deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). Thus, as with any motion for summary judgment, the court must review the facts and reasonable inferences therefrom in the light most favorable to the party opposing that motion. *Id.*

## III.  ANALYSIS

### A.  Choice of Law

This Court is presiding over a diversity action in Maryland, and thus applies Maryland choice of law rules. *See Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999) ("A federal court sitting in diversity must apply the choice-of-law rules from the forum state."). For causes of action sounding in tort, Maryland adheres to the *lex loci delicti* rule, applying the substantive law of the state in which the alleged tort took place. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 744–45 (2000). For causes of action sounding in contract, Maryland follows the doctrine of *lex loci contractus*, applying the substantive law of the place where the contract was formed. *Allstate Ins. Co. v. Hart*, 327 Md. 526, 529 (1992). Finally, where a case involves causes of action sounding in tort and contract, Maryland embraces the concept of "dépeçage." That is, the court

will apply *lexi loci delicti* to the tort-based issues and *lex loci contractus* to those based in a contract. *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 620 (2007).

Dehghan originally argued, in connection with a prior motion to dismiss, that Iranian law governs this case because Dastranj's alleged injuries occurred in Iran. *See* ECF No. 59 at 4–8. Indeed, the meetings between Dehghan and Dastranj, the transfer of Dastranj's funds, and Dastranj's subsequent efforts to recapture his investment, all occurred in Iran. But this Court cannot apply foreign law unless "the requirements of Rule 44.1 of the Federal Rules of Civil Procedure are [first] met." *Baker v. Booz Allen Hamilton, Inc.*, 358 F. App'x 476, 481 (4th Cir. 2009). Rule 44.1 states:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

Where, as here, a party fails to carry its burden under Rule 44.1, the forum law applies. *Baker*, 358 F. App'x at 481(citing *Ferrostaal, Inc. v. M/V Sea Phoenix*, 447 F.3d 212, 216 (3d Cir. 2006) and *The Hoxie*, 297 F. 189, 190 (4th Cir. 1924), for its holding in a "pre-Rule 44.1 case, that forum law applies unless the party seeking to use foreign law establishes that foreign law differs from forum law")).

At the motion to dismiss stage, Dehghan failed to satisfy his burden under Rule 44.1 regarding application of foreign law, and has since abandoned his efforts in this regard. Dehghan now concedes that Maryland law applies to Dastranj's common law claims. *See* ECF No. 66-1 at 10. The Court will therefore apply Maryland law to Dastranj's common law claims of breach of contract, unjust enrichment, and fraud.

In Counts IV and V of his complaint, Dastranj alleges that Dehghan violated two North Carolina statutes—§ 75.1.1 of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. Ann. § 75-1.1; and § 78A–8 the North Carolina Securities Act ("NCSA"), N.C. Gen. Stat. Ann. § 78A–8. *See* ECF No. 1 at 9–12. Section 75–1.1 of UDTPA declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." Section 78A–8 of the NCSA prohibits persons, "in connection with the offer, sale or purchase of any security, directly or indirectly: (1) To employ any device, scheme, or artifice to defraud; (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading or; (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." A claim under the NCSA is, in many ways, like an action under the UDTPA. *See Associated Packaging, Inc. v. Jackson Paper Mfg. Co.*, No. 10 CVS 745, 2012 WL 707038, at *4 (N.C. Super. Mar. 1, 2012).

In support of the North Carolina statutory claims, Dastranj alleges that Dehghan duped Dastranj to transfer funds based on false promises of facilitating Dastranj's investment in the EB-5 Project. Dehghan's deceptive conduct, says Dastranj, not only violated the UDTPA, but also the NCSA because it was in furtherance of the sale of a security, namely, a stake in the EB-5 Project. If Dastranj were to prevail on his UDTPA claim, he is entitled to treble damages pursuant to N.C. Gen. Stat. § 75-16. *See Marshall v. Miller*, 302 N.C. 539, 547 (1981) (finding that the "Legislature intended trebling of any damages assessed to be automatic once a violation is shown."). The Court in its discretion may also award attorney's fees to the prevailing party pursuant to N.C. Gen. Stat. § 75-16.1. For the NCSA violation, Dastranj seeks compensatory

damages in excess of $525,000 as well as reasonable attorneys' fees and costs. *See* ECF No. 1 at 12.

Because violations of these statutes sound in tort, both Maryland and North Carolina apply the *lex loci* rule in deciding whether the statutory claims shall lie. *Cf. Jones v. Koons Auto., Inc.*, No. DKC 09-3362, 2013 WL 3713845, at *6 (D. Md. July 15, 2013) (applying *lex loci delicti commissi* to determine the applicability of the Maryland Consumer Protection Act); *ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983) (determining that North Carolina would use the *lex loci* rule to determine whether N.C. Gen. Stat. § 75–1.1 was applicable); *United Virginia Bank v. Air-Lift Assocs., Inc.*, 79 N.C. App. 315, 320–21 (1986) (citing *ITCO*); *Window World of Baton Rouge, LLC v. Window World, Inc.*, No. 15 CVS 1, 2017 WL 2979142, at *9 (N.C. Super. July 12, 2017); *Associated Packaging, Inc. v. Jackson Paper Mfg. Co.*, No. 10 CVS 745, 2012 WL 707038, at *5 (N.C. Super. Mar. 1, 2012) (determining that *lex loci* is the conflict of law rule that applies to NCSA claims). The *lex loci delicti* rule compels that a party's substantive rights are determined according to the law of the state where the injury occurred. *See Zander v. United States*, 786 F. Supp. 2d 880, 883 (D. Md. 2011); *Anderson v. Piedmont Aviation, Inc.*, 68 F. Supp. 2d 682, 685 (M.D.N.C. 1999) (citing *Boudreau v. Baughman*, 322 N.C. 331 (1988)).

Here, the acts giving rise to Dastranj's injuries under the UDTPA and NCSA all occurred in Iran. Dehghan offered to sell Dastranj a stake in the EB-5 Project and accepted transfers of Dastranj's investment through a series of meetings in Iran. Dastranj then transferred his funds from his bank account in Iran to Dehghan's bank account, also in Iran. Dehghan continued to lull Dastranj into believing return of the funds was imminent while Dastranj was in Iran, and the investment funds were never transferred out of Iran. Indeed, Dastranj never set foot on United

States soil. Dastranj's injuries, therefore, cannot be said to have occurred anywhere but Iran, let alone North Carolina.

Because neither party properly addressed this issue in their briefs, the Court allowed supplemental briefing on the applicability of the *lex loci* rule as to Plaintiff's North Carolina statutory claims. Dastranj now argues that the North Carolina statutes apply because Dehghan induced Dastranj to invest in a North Carolina based EB-5 Project; Dehghan has since moved to North Carolina; and certain of Dehghan's conduct, such as Dehghan falsely presenting to Dastranj through a mutual acquaintance in Iran a check issued from a North Carolina bank account, pulls this case within the ambit of the North Carolina statutes. *See* ECF No. 97. The Court disagrees.

None of Dastranj's newly identified conduct amounts to proof that Dastranj's *injury* occurred in North Carolina. That Dehghan at some point lived in North Carolina does not change that Dastranj's funds were taken in Iran. Similarly, Dehghan's presentation, through an intermediary, of a check from a North Carolina bank account to lull Dastranj into a false sense of impending repayment does not change that the presentation itself, and thus the false inducement, occurred in Iran. In short, none of Dastranj's injuries occurred in North Carolina. Dastranj's UDTPA and the NCSA (Counts IV and V), therefore, must be dismissed.

**B.     Plaintiff Farhad Dastranj's Motion for Summary Judgment (ECF No. 67)**

Dastranj moves for summary judgment on Counts I through V of his complaint.[4] Counts IV and V have already been dismissed. The Court will address the remaining three Counts in turn.

---

[4] Dastranj abandons Count VI of the Complaint alleging violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

1. **Breach of Contract (Count I)**

Maryland recognizes the validity of oral contracts. *See HBCU Pro Football, LLC v. New Vision Sports Properties, LLC*, No. WDQ-10-0467, 2011 WL 2038512, at *4 (D. Md. May 24, 2011) (citing *Peoples Drug Stores v. Fenton Realty Corp.*, 191 Md. 489, 493–94 (1948)). To sustain a breach of contract claim under Maryland law, a plaintiff must prove: (1) the existence of a contractual obligation owed, and (2) a breach of that obligation. *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). A contract exists under Maryland law where there is "mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004) (citing *Peer v. First Fed. Sav. and Loan Ass'n of Cumberland*, 273 Md. 610 (1975)); *Maslow v. Vanguri*, 168 Md. App. 298, 321 (2006) (citations omitted) ("In other words, an agreement that omits an important term, or is otherwise too vague or indefinite with respect to essential terms, is not enforceable.").

Dastranj contends that he and Dehghan entered into an oral agreement wherein Dastranj would make periodic payments to Dehghan until the payments reached at least the $500,000 needed to further Dastranj's EB-5 visa application. *See* Compl., ECF No. 1 at 5–6. Dehghan further agreed that he would return Dastranj's money if Dastranj did not participate in the EB-5 program. Dastranj further contends that Dehghan breached the agreement by refusing to return his funds after Dastranj could not obtain a visitor visa to inspect the EB-5 project. *Id.* at 6.

Dehghan does not dispute the above facts. Rather, Dehghan argues that the breach of contract claim fails as a matter of law because the parties' discussions do not constitute an oral agreement. *See* ECF No. 86-1 at 16–21. Dehghan relies almost exclusively on *Dolan v. McQuaide*, 215 Md. App. 24 (2013) for the proposition that an oral contract is void if it is "so vague and indefinite that it is not possible to collect from it the intention of the parties." *Dolan*,

215 Md. App. at 32 (quoting *Robinson v. Gardiner*, 196 Md. 213, 217 (1950)). *Dolan*, however, does not compel Dehghan's desired outcome.

In *Dolan,* the plaintiff's breach of contract claim arose from discussions that she had with defendant about providing business planning services in exchange for a share of the defendant's business. The business plans were discussed "only in general terms." *Id.* at 34. Because the Plaintiff's evidence lacked the detail necessary to ascertain the parties' respective obligations, "the parties cannot be bound by such vague terms as a matter of law." *Id.* Equally important, the *Dolan* court further determined that the parties' course of conduct did not support the contract's existence where the oral representations themselves were too vague and indefinite to constitute an agreement. *See id.* at 34–35 (explaining that "conduct *cannot* form an *oral* contract") (emphasis in original).

Here, by contrast, the parties' undisputed discussions were sufficiently concrete to establish an oral contract. Both Dehghan and Dastranj testified that they met in Iran regarding the EB-5 program, during which time they discussed that Dehghan would accept interim payments and hold the funds in his Iranian bank account until it reached the equivalent of $ 575,000. ECF No. 91-34 at 2–3; Dehghan Dep., ECF No. 91-14 at 52. Further, the parties discussed that Dehghan would return the funds if Dastranj was unable to obtain an OFAC license, B-1/B-2 tourist/business visa to visit the EB-Project, or his EB-5 Visa. ECF No. 91-34 at 2–7; ECF No. 91-14 at 52. The parties then acted consistently with this agreement in that Dehghan accepted several payments from Dastranj periodically between 2010 and 2013 toward Dastranj's EB-5 investment, and discussed via email Dehghan's obligation to return Dastranj's investment upon Dastranj's demand. ECF Nos. 91-17, -18, -19, -20, -21, -22, -23, -24, -34 at 3–5. Accordingly,

when considering the evidence in the light most favorable to Dehghan, the parties' discussions amounted to an oral agreement.

Dehghan alternatively argues that even if an oral agreement existed, its terms were illegal and therefore unenforceable. Specifically, Dehghan claims that Dastranj's asset transfer from his Bank of Sadarat account to Dehghan's Bank of Pasargad account violated the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. §§ 560.101–560.901, promulgated pursuant to the International Emergency Economic Powers Act ("IEEPA"). Under the IEEPA, "the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—(A) investigate, regulate, or prohibit—(i) any transactions in foreign exchange." 50 U.S.C. § 1702(a)(1). *See also United States v. Saboonchi*, No. CRIM. PWG-13-100, 2014 WL 1831149, at *1 (D. Md. May 7, 2014). The ITSR generally prohibits the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran. ITSR, § 560.204. Additionally, the ITSR prohibits United States persons from engaging in transactions related to goods or services of Iranian origin. ITSR, § 560.206(a). The ITSR defines a "United States person" to mean any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States. ITSR, § 560.314.

OFAC, however, has expressly carved out exceptions surrounding participation in the EB-5 program. 31 C.F.R. § 560.505(c)(1) plainly states that "U.S. persons are authorized to engage in all transactions necessary to export financial services to Iran in connection with an individual's application for . . . an immigrant visa under category EB-5 (immigrant investor)." OFAC issues a specific license to engage in particular transactions otherwise prohibited by the

ITSR. 31 C.F.R. § 501.801.  If EB-5 efforts fail, the regulations also allow for the return of

invested funds to Iranian applicants. 31 C.F.R. § 560.505(c)(2) provides:

> In the event services are exported under paragraph (c)(1) of this section in
> connection with an application for an E–2 or EB–5 visa that is denied, withdrawn,
> or otherwise does not result in the issuance of such visa, U.S. persons are
> authorized to transfer, in a lump sum back to Iran or to a third country, any funds
> belonging to the applicant that are held in an escrow account during the pendency
> of, and in connection with, such visa application, provided that any transfer of
> funds pursuant to the authorization set forth in this paragraph is effected in
> accordance with § 560.516.

Here, it is undisputed that Dastranj received the OFAC license authorizing Plaintiff's

funds to be transferred to the United States for investment in the EB-5 project. ECF No. 67-4 at

2; IA-16312 License, ECF No. 91-31. Further, it is undisputed that Dastranj is not a "United

States person" and so the oral agreement as to him is in not illegal. Accordingly, Dehghan has

failed to demonstrate how the oral agreement must be declared void on the grounds of illegality.

Dehghan more specifically contends that the illegality surrounds the transfer of funds

between Dastranj's and Dehghan's banks because both financial institutions are "banned" under

the IEEPA. It is true that the United States has from time to time issued Executive Orders

prohibiting transactions with Iranian entities designated by OFAC and placed on OFAC's list of

"Specially Designated Nationals" ("SDNs"). SDNs are defined as "individuals and companies

owned or controlled by, or acting for or on behalf of, targeted countries." *See* United States

Treasury Website, https://www.treasury.gov/resource-center/sanctions/SDN-

List/Pages/default.aspx. Further, it is undisputed that at the relevant times the involved banks

were SDNs and therefore "U.S. persons are generally prohibited from engaging in any

transactions directly or indirectly involving" the banks. ECF No. 91-31 at 3–4.  Dehghan

therefore argues that Dastranj was prohibited from transferring his investment money from his

banned bank to Dehghan's banned bank. *See generally* ECF No. 86-1 at 5–12. That Dastranj

transferred the funds, argues Dehghan, means that he came to transaction with unclean hands.[5] Likewise, Dehghan claims that he, as a United States citizen, cannot now legally transfer the funds back to Dehghan without risking civil penalties and criminal prosecution.

Dehghan's arguments fail for several reasons. First, illegality is an affirmative defense that must be raised timely or it is waived. Federal Rule of Civil Procedure 8(c) expressly provides "[i]n responding to a pleading, a party must *affirmatively state any avoidance or affirmative defense*, including . . . illegality." (emphasis added). Similarly, unclean hands as an affirmative defense must be timely plead or it too is waived. *See, e.g.*, *Re/Max v. Underwood*, No. WDQ-10-2367, 2011 WL 2118911, at *4 (D. Md. May 25, 2011) (citing cases). *See also Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999), *overruled on other grounds by Desert Palace v. Costa*, 539 U.S. 90 (2003) ("[F]ailure to raise an affirmative defense in the appropriate pleading results in waiver").

Here, Dehghan answered the complaint on October 16, 2015 and asserted four affirmative defenses, none of which concerned illegality or unclean hands. *See generally* Answer, ECF No. 10. Instead, Dehghan first raised these defenses in his opposition to Plaintiff's motion for summary judgment, well beyond the close of discovery. Accordingly, Dehghan's last-minute assertions have unfairly surprised and prejudiced Dastranj. *Cf. Brinkley*, 180 F.3d 598, 613 (4th Cir. 1999) (finding no prejudice where the defendant raised and litigated the "factor-other-than-sex" defense during prior administrative review of plaintiff's claims). Plaintiff lost all opportunity to engage in written discovery, take testimony on these issues, or investigate the claims with involved third party agencies such as OFAC. Because Plaintiff has been totally

---

[5] The unclean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Pediamed Pharm., Inc. v. Breckenridge Pharm., Inc.*, 419 F. Supp. 2d 715, 727 (D. Md. 2006) (internal quotations omitted) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945).

deprived of his opportunity to rebut these affirmative defenses, he has indeed been prejudiced by Dehghan's late disclosure. Dehghan has, thus, waived his right to pursue the defenses of illegality and unclean hands.

Alternatively, even if these affirmative defenses were available, no evidence exists that the agreement itself was "illegal" or that Dastranj has come to the Court with unclean hands. The undisputed evidence reflects that Dehghan agreed to accept Dastranj's periodic payments in rials until they totaled the equivalent of $575,000, and then transfer such funds to the United States in connection with Dastranj's EB-5 application. The parties further agreed that in the event Dastranj did not obtain an OFAC license, the EB-5 visa, or permission to enter the United States, Dehghan would return the money. Importantly, the parties' agreement never contemplated *where* Dehghan would hold the funds. That Dehghan chose to park the funds in a banned bank does not mean it was a term of the agreement itself. Furthermore, because the ITSR circumscribes transactions of "U.S. persons," Dastranj, as a citizen of Iran, is not subject to its prohibitions. Dehghan has provided no legal support for voiding the contract as to Dastranj where the contract itself included no illegal provisions, and where the contract as a whole was not illegal as to the Plaintiff.

Finally, it bears noting that Dehghan's claims of illegality and unclean hands read as a thinly veiled attempt to avoid either honoring his agreement with Dastranj or satisfy a money judgment related to his breach. Certainly, no law prohibits Dehghan from repaying Dastranj the sum of money that Dastranj is owed pursuant to their agreement. The law, at best, may prohibit Dehghan from using the funds held in a banned Iranian bank to satisfy the debt owed to Dastranj. It does not prevent Dehghan him from repaying Dastranj with other funds, as Dehghan conceded during the August 4th hearing. Because money is indeed fungible, Dehghan can repay Dastranj

with funds from a source other than those held by the banned bank and avoid any claimed "illegality."  Plaintiff's motion for summary judgment as to the breach of contract claim is, therefore, granted.

The Court next turns to whether any genuine disputed material fact exists as to Plaintiff's claimed damages. In Maryland, the injured party in a breach of contract action "may recover damages for (1) the losses proximately caused by the breach, (2) that were reasonably foreseeable, and (3) that have been proven with reasonable certainty." *Hoang v. Hewitt Ave. Assocs., LLC*, 177 Md. App. 562, 594 (2007) (citations omitted). The goal is for the non-breaching party to recover damages that will place him in the monetary position he would have occupied if the contract had been properly performed. *B & P Enterprises v. Overland Equipment Co.*, 133 Md. App. 583 (2000).  Thus, the non-breaching party is entitled to compensatory damages which are the natural and proximate consequence of the breach, or which are reasonably within the parties' contemplation at the time of contracting. *Munday v. Waste Mgmt. of N. Am., Inc.*, 997 F. Supp. 681, 685 (D. Md. 1998).

The plaintiff bears the burden of proving damages with reasonable certainty, and cannot rest on speculation or conjecture. *Kirby v. Chrysler Corp.*, 554 F. Supp. 743, 752 (D. Md. 1982) (citing *Lazorcak v. Feuerstein*, 273 Md. 69 (1974) and *Charles County Broadcasting Company, Inc. v. Meares*, 270 Md. 321 (1973)). While "[s]peculation or conjecture" is insufficient, *Kirby*, 554 F. Supp. at 752, reasonable certainty does not require "mathematical precision." *David Sloane, Inc. v. Stanley G. House & Assocs., Inc.*, 311 Md. 36, 41 (1987) (quoting *M & R Contractors & Builders, Inc. v. Michael*, 215 Md. 340, 349 (1958)).

The parties do not dispute that Dastranj transferred the following amounts into Dehghan's Iranian bank account in connection with their agreement:

1,900,000,000 Iranian Rials (IRR) on April 26, 2011;

1,000,000,000 IRR on September 27, 2011;

180,000,000 IRR on October 19, 2011;

1,150,000,000 IRR on December 12, 2011;

220,000,000 IRR on December 28, 2011; and

500,000,000 IRR on February 15, 2012.

The total transferred is 5,150,000,000 IRR. *See* ECF No. 67-2 at 4–5. Nor do the parties dispute that the legal measure of damages is the amount owing to Dastranj if the contract had been properly performed, or the value of the funds at the time Dastranj demanded return of his investment. Finally, neither side disputes that Dastranj's investment was always measured by its U.S. dollar equivalent, especially given the parties agreement expected that transfer of the funds to the United States occur only after the payments totaled the equivalent of $ 575,000 U.S. dollars.

Rather, the parties' dispute concerns the date(s) used convert the value of the rials that Dastranj had invested into the U.S. dollar equivalent. Dastranj argues that he is entitled to the United States dollar equivalent of each transfer based on the exchange rate in place on the date of each transfer. *See* 67-1 at 9. Dehghan, on the other hand, argues that Dastranj is entitled to the present United States dollar equivalent of the rials currently held in Dehghan's Iranian bank account. Because the rial has experienced a steady and significant devaluation vis the United States dollar, the delta between the parties' positions is substantial. According to Dastranj's economic expert, the sum of the dollar equivalent of each of Dastranj's transfers at the time each transfer was made equals $477,331.35. *See* ECF No. 91-15 at 3. But the dollar value of the funds

transferred into Dehghan's account as of May 26, 2016, which was the date of the last valuation, equals $169,135.00. *Id.* at 4.

Neither party's measure of damages is legally correct. The parties do not dispute that Dastranj first formally requested his money back in May 2013; nor do they dispute that had Dehghan upheld his end of the bargain, he would have returned the money as of May 2013. Accordingly, no issue of genuine disputed material fact exists as to the date of the breach—May 2013. Accordingly, to return Dastranj to his financial position had Dehghan performed on the contract requires calculating the value of Dastranj's investment in U.S. dollars as of May 2013.

Dastranj's attempt to value damages at the time of his initial investments, therefore, makes little sense. While Dastranj was making periodic payments, Dehghan was not in breach. The devaluation of the rial over the course of the periodic payments—but prior to Dehghan's breach—certainly was a risk of the agreement itself, but it is not a compensable loss resulting from Dehghan's breach. By the same token, further devaluation of the real post-breach cannot be laid at Dastranj's feet. Post-breach devaluation is solely the product of Dehghan's refusal to honor his end of the agreement and return the funds. Therefore, the proper measure of compensatory damages is the value of the Dastranj's investment in U.S. dollars as of May 2013.

Expecting as much, Dastranj argues in the alternative that he is entitled to $419,313.00 as the dollar value of his investment as of May 31, 2013. *See* 67-1 at 9; ECF No. 91-15 at 4. Dehghan does not dispute this conversion rate. *See* ECF No. 67-2 at 7. Accordingly, because no genuine disputed material fact exists as to the date of Dehghan's breach, the amount in rials of Dastranj's investment at the time of the breach, or the U.S. dollar equivalent of the investment at the time of the breach, the Court finds that Dastranj is entitled to summary judgment as to compensatory damages in the amount of $419,313.00.

Dastranj also requests an award of prejudgment interest at a rate of six percent per annum running from May 31, 2013. "[I]nterest is allowable as a matter of right for a breach of contract to pay when the amount due has been liquidated, ascertained, or agreed to." *United States v. State of W.Va.*, 764 F.2d 1028, 1031 (4th Cir. 1985); *Wood Prods., Inc. v. CMI Corp.*, 651 F. Supp. 641, 653 (D. Md. 1986). In Maryland, the legal rate of interest is six percent per annum. *Mitchell v. Kentmorr Harbour Marina*, No. WMN–19–0337, 2011 WL 5826674, at *5 (D. Md. Nov. 17, 2011) (citing Md. Const. art. III, § 57). The total amount due to Dastranj, $419,313.00, has been ascertained and became due at the time Dastranj requested a return of his investment on or about May 31, 2013. To deny Dastranj prejudgment interest for his loss would deprive him of a substantial part of his compensation and reward Dehghan for his refusal to return the investment for over four years. The Court will therefore award Dastranj prejudgment interest on the principal amount of $419,313.00 at a simple interest rate of six percent per annum from May 31, 2013 to August 17, 2017, the date the Court entered judgment on this Count.

**2. Unjust Enrichment (Count II)**

Dastranj alternatively brought a claim for unjust enrichment in the event that no enforceable contract existed between the parties. "It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties." *FLF, Inc. v. World Publications, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998). Because the Court granted summary judgment on Plaintiff's contract claim, Dastranj's motion for summary judgment is denied with respect to Count II, and for the reasons articulated in Section III.B.1. *infra*, the Court dismisses Count II.

**2.      Fraud (Count III)**

To establish a claim for fraudulent misrepresentation in Maryland, the plaintiff must demonstrate that (1) the defendant made a false representation to the plaintiff, (2) the defendant knew the misrepresentation was false, or made the misrepresentation with reckless indifference to its truth or falsity, (3) the defendant made the misrepresentation "for the purpose of defrauding the plaintiff," (4) the plaintiff relied, and had a right to rely, on the misrepresentation, and (5) the plaintiff suffered compensable damages resulting from the misrepresentation. *Hoffman v. Stamper*, 385 Md. 1, 28 (2005).

In opposing Dastranj's motion for summary judgment, Dehghan does not address the fraud claim at all. In his own motion for summary judgment, Dehghan simply argues that Plaintiff failed to plead fraud with particularity as Rule 9(b) of the Federal Rules of Civil Procedure requires. *See* ECF No. 66-1 at 14–16. Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." As the Court of Appeals for the Fourth Circuit has explained, Rule 9(b) has four purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

The Court finds that Dastranj's fraud claim satisfies Rule 9(b). Dehghan conceded as much when he filed an answer to the Complaint without challenging its sufficiency. *See* ECF No. 10. Dastranj has since generated facts sufficient to allow this claim to proceed. In particular, Dehghan testified that he represented to Dastranj he would return Dastranj's money if Dastranj did not obtain an OFAC license, an EB-5 visa, or a visa to visit the EB-5 Project in the United

States. *See* ECF No. 91-34 at 3; ECF No. 91-14 at 52. Dastranj relied on Dehghan's representation and transferred funds Dehghan's bank throughout 2010, 2011, and 2012. *See* ECF No. 91-1, -2, -3, -4, -5, -6, -7, -8, -9, -10, -11. When Dastranj demanded that Dehghan return his investment, Dehghan then attempted to mollify Dastranj with emails promising to return the money. ECF No. 91-18, -19, -20, -21, -22, -23, -24. Dehghan further claimed that he would repay Dastranj when he, Dehghan, was paid, and even had a mutual acquaintance show Dastranj a check cut from Dehghan's United States bank account as a good faith gesture of intended repayment. Dastranj, relying on Dehghan's representations, deferred filing suit or seeking other forms of relief. ECF No. 91-34 at 6. Dehghan's representations were ultimately proven false because he never returned Dastranj's investment.

The evidence construed in the light most favorable to Dehghan demonstrates that he materially misrepresented plans to repay Dastranj, and Dastranj relied on such statements to his detriment. However, the evidence is less conclusive with regard to whether defendant knew the representations were false or made them with reckless disregard for the truth and with the intent to deceive or mislead at the time he made them. *Smith v. Integral Consulting Servs., Inc.*, No. DKC 14-3094, 2016 WL 4492708, at \*10 (D. Md. Aug. 26, 2016) (citations omitted). Intent to deceive and similar scienter requirements are customarily fact intensive inquiries, dependent on the credibility of the testifying witness, and thus ill-suited for resolution at the summary judgment stage. *Cf. Tenax Corp. v. Tensar Corp.*, 743 F. Supp. 1204, 1208 (D. Md. 1990) (analyzing issues of fraud in a patent case). Here, the Court cannot conclude as a matter of law that Dehghan's representations to Dastranj were uttered with intent to mislead. To be sure, Dehghan still refuses to return Dastranj's investment to this day. However, a jury is entitled to hear Dehghan's reasons for not returning the funds and decide whether his promises to repay

were genuine or fraudulent. For example, the parties vigorously dispute whether Dehghan refused to return the funds because he always intended to steal from Dastranj, or because Dastranj demanded that he be paid in dollars and not rial. ECF No. 91-14 at 107. The parties further dispute whether Dehghan genuinely intended to pay Dastranj back as soon as Investco paid him, or whether that too was a fraudulent ruse. Accordingly, because genuine issues of disputed fact exist as to Dehghan's intent to deceive, Dastranj's motion for summary judgment is denied as to Count III.

## C.    Defendant Mehdi Dehghan's Motion for Summary Judgment (ECF No. 66)

Dehghan moves for summary judgment on the same bases articulated in his opposition to Dastranj's motion for summary judgment. Dehghan specifically contends that summary judgment in his favor is warranted on the breach of contract claim because the contract was illegal and therefore unenforceable. *See* ECF No. 66-1 at 10–13. For the same reasons previously articulated, Dehghan's motion for summary judgment on Count I is denied. [6]

As to Count II, unjust enrichment, Dehghan's motion is granted. As a matter of law, unjust enrichment only survives where a breach of contract claim fails. Because Dastranj has prevailed on his breach of contract claim, unjust enrichment must be dismissed. *See FLF, Inc. v. World Publications, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998). Dehghan's motion as to Count III, fraud, is denied and Dehghan's motion for summary judgment is granted with respect to Counts IV, V for the reasons previously articulated. Dastranj has voluntarily abandoned Count VI, so it too will be dismissed.

---

[6] At the August 4, 2017 hearing, the parties referenced that Dastranj's had settled previously with the dismissed Third Party Defendants for $ 200,000, which may require this Court to adjust the judgment on the breach of contract count to avoid double recovery. The Court will schedule a follow-up status conference regarding the outstanding fraud count, at which time it will also address the propriety of any motion to alter or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to address what impact, if any, Dastranj's settlement with the Third Party Defendants visits on the judgment in this case.

## IV. CONCLUSION

For the reasons stated above, Dastranj's motion for summary judgment is granted with respect to Count I (Breach of Contract) on liability and damages, and denied with respect to Counts II (Unjust Enrichment), III (Fraud), IV (North Carolina UDTPA), and V (NCSA). Dehghan's motion for summary judgment is granted with respect to Counts II, IV, V, and VI, but is denied with respect to Count III. Dastranj has voluntarily abandoned Count VI (Securities Act) so it too will be dismissed.  A separate Order follows.

8/17/2017                                                                   /S/
Date                                                                        Paula Xinis
United States District Judge